# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL WITMER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0807-MTZ |
| | ) | |
| ARMISTICE CAPITAL, LLC, | ) | |
| ARMISTICE CAPITAL MASTER FUND | ) | |
| LTD., STEVEN BOYD, JOSHUA | ) | |
| DISBROW, GARY CANTRELL, JOHN | ) | |
| DONOFRIO, JR., CARL DOCKERY, and | ) | |
| KETAN B. MEHTA, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AYTU BIOPHARMA, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 14, 2025
Date Decided: August 14, 2025

Thomas A. Uebler, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, DE; Andrew W. Robertson, William H. Spruance, MORRIS KANDINOV LLP, New York, NY, *Attorneys for Plaintiff Paul Witmer.*

Matthew F. Davis, Adriane M. Kappauf, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Douglas A. Rappaport, AKIN GUMP STRAUSS HAUER & FELD LLP, *Attorneys for Defendants Armistice Capital, LLC and Armistice Capital Master Fund Ltd.*

**ZURN, Vice Chancellor.**

A stockholder of the nominal defendant company alleges that company overpaid on two transactions that benefitted the company's largest investor. The stockholder also alleges the investor improperly traded on inside information. The stockholder brought derivative claims against the investor for breach of fiduciary duty, insider trading, aiding and abetting, and unjust enrichment. The investor moved to dismiss, presenting five questions for adjudication.

The first is whether a company's decision to permit a stockholder to pursue derivative claims against an investor should be set aside because the company granted that permission in a settlement agreement. I conclude the company's decision remains paramount in that context. It follows that demand is excused.

The second is whether the stockholder pled the investor exerted transaction-specific control over the asset purchases via the investor's large stake in the company, the investor's board designee, his role in the process and ties to management, and the company's disclosure that the investor could exercise control. I conclude the plaintiff did not plead actual control and so failed to saddle the investor with fiduciary duties at the pleading stage.

The third is whether the stockholder pled the investor owed fiduciary duties for purposes of an insider trading claim based solely on its board designee's access to confidential company information. I conclude that theory has no foothold in Delaware law.

The fourth is whether the stockholder pled an aiding and abetting claim against the investor. The investor's knowing participation is not well-pled.

The fifth is whether the stockholder pled an unjust enrichment claim. I find he did not.

## I. BACKGROUND[1]

The facts are drawn from the operative complaint, the documents integral to it, and those incorporated by reference. The stockholder demanded and received books and records before filing its complaint in this action.[2]

### A. Aytu and Armistice

Plaintiff Paul Witmer is a stockholder of nominal defendant Aytu Biopharma, Inc. ("Aytu"), a publicly traded pharmaceutical company incorporated

---

[1] Citations in the form "SAC" refer to the plaintiff's second amended complaint in this action, available at docket item ("D.I.") 34. Citations in the form "OB –" refer to the defendants' opening brief, available at D.I. 42. Citations in the form "AB –" refer to the plaintiff's answering brief, available at D.I. 46. Citations in the form "RB –" refer to the defendants' reply brief, available at D.I. 50. Citations in the form "Defs. Supp. –" refer to the defendants' supplemental brief, available at D.I. 78. Citations in the form "Pl. Supp." refer to the plaintiff's supplemental brief, available at D.I. 81. Citations in the form "Kappauf Aff." refer to the affidavit of Adriane M. Kappauf, available at D.I. 41. Citations in the form "Pl's Ex." refer to the exhibits attached to the plaintiff's answering brief, available at D.I. 46.

[2] It is unclear to me whether the parties agreed to incorporate the company's entire production into the complaint. *See, e.g.*, *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796–99 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019). The parties only rely on documents explicitly incorporated in the complaint. Those include emails, company policies, and board minutes, but no board materials.

3

in Delaware.[3]  Armistice Capital, LLC is a Delaware-incorporated hedge fund primarily focused on the health care and consumer sectors.[4]  It operates Armistice Capital Master Fund Ltd., a Cayman Island limited company and investment fund (together with Armistice Capital, "Armistice").[5]  Armistice held Aytu equity from 2017 to 2020.[6]  Steven Boyd is Armistice Capital's founder, Chief Investment Officer, and Managing Partner.[7]  He sat on Aytu's board from April 2019 to August 2021.[8]

In November 2018, Armistice lent Aytu $5 million at 8% for three years.[9] The promissory note was guaranteed by Aytu's revenues from a contemporaneous licensing agreement with Tris Pharma, Inc.[10]  Boyd learned of the Tris deal through his service as a director at Cerecor Inc., and Boyd brokered the deal between Tris and Aytu.[11]  In January 2019, Armistice exchanged the promissory

---

[3] SAC ¶¶ 12–14.

[4] *Id.* ¶ 15.

[5] *Id.* ¶ 16.

[6] *Id.* ¶¶ 4, 7, 24, 128.

[7] *Id.* ¶ 17.

[8] *Id.*

[9] *Id.* ¶ 27.

[10] *Id.*

[11] *Id.* ¶¶ 27–30.

note for Aytu common stock at a discounted rate and warrants to purchase additional common stock.[12]

When Aytu approved the promissory note and Tris deal, it also expanded its board by two seats so Boyd and a non-Armistice-affiliated director could join.[13] Boyd joined in April 2019.[14] During his tenure, Boyd worked closely with Aytu's CEO Joshua Disbrow, consulting privately about Aytu's financial position and business strategy, and assisting Disbrow with arranging certain financing arrangements for Aytu.[15]

As of April 2019, Armistice had a 41.1% stake in Aytu.[16] At this time, Aytu's board noted Armistice would be an interested stockholder for purposes of 8 *Del. C.* § 203.[17] In Aytu's 10-K for the fiscal year ending June 2019, Aytu disclosed that because of Armistice's ownership and Boyd's board seat, Armistice "could be able to exert significant control over" Aytu.[18]

### B. The Challenged Transactions

In late 2019 and early 2020, Aytu entered into two transactions with

---

[12] *Id.* ¶ 38.

[13] *Id.* ¶ 32.

[14] *Id.* ¶ 33.

[15] *Id.* ¶¶ 26, 133, 138.

[16] *Id.* ¶ 40.

[17] *Id.* ¶ 41.

[18] *Id.* ¶ 42.

Armistice portfolio companies. At that time, Aytu's board consisted of seven directors.[19] First, Aytu acquired Innovus Pharmaceuticals Inc. ("Innovus" and the "Innovus Transaction"), which included a "portfolio of over thirty consumer products competing in large therapeutic categories, including diabetes, men's health, sexual wellness and respiratory health."[20] Armistice held 10% of Innovus's equity.[21]

Negotiations began in summer 2019. Boyd was a member of a two-person special committee (the "Review Committee") that reviewed Aytu's proposed terms for purchasing Innovus before the full board did.[22]

After the Review Committee reviewed the proposed terms, the full board met to review and discuss Aytu's letter of intent on July 24, 2019.[23] The board received materials from management about Innovus, including its recent revenue generation and potential synergies.[24] But the board was not informed of Innovus's financial issues: that Innovus had never earned a profit, operated at a large deficit, and was in financial distress.[25] The board did not review Innovus's financial

---

[19] *Id.* ¶¶ 17–23, 61 n.2.

[20] *Id.* ¶¶ 45, 47.

[21] *Id.* ¶ 46.

[22] *Id.* ¶ 61.

[23] *Id.*; Pl's Ex. 6 at -0300.

[24] SAC ¶¶ 57, 59.

[25] *Id.* ¶¶ 48, 57–58.

reports.[26] The board was not told of Armistice's stake in Innovus at this meeting.[27] After discussion, the board determined the LOI's terms were acceptable to Aytu and its stockholders, and voted to authorize Aytu management to negotiate the deal.[28]

On September 10, the board met again to discuss the Innovus Transaction and to vote.[29] Disbrow gave the board a summary of discussions with Innovus and "discussed the structure of the transaction, key deal terms, and the potential timeline for completing the acquisition."[30] The terms had not substantially changed since July.[31] Then the Aytu board discussed Boyd and Armistice's interest in the transaction, and "the benefits and potential risks" of the transaction.[32] Boyd left the meeting for the vote; then the board approved the Innovus Transaction.[33] Plaintiff alleges Armistice and Boyd knew material information about Innovus's financials because of Armistice's stake in the

---

[26] *Id.* ¶ 57.

[27] *Id.* ¶ 60.

[28] *Id.* ¶ 61; Pl's Ex. 6 at -0301–02.

[29] SAC ¶¶ 62–64; Pl's Ex. 7.

[30] Pl's Ex. 7 at -0304.

[31] SAC ¶ 56. One substantial addition included a warrant exchange: Aytu agreed to issue convertible preferred stock to retire warrants held by Innovus investors, including Armistice. *Id.*

[32] Pl's Ex. 7 at -0305.

[33] *Id.*

company, but Boyd did not share that additional information with the board.[34] The board did not retain a financial advisor or seek a fairness opinion in connection with the Innovus Transaction.[35]

As consideration, Aytu agreed to pay Innovus stockholders $8 million, lend Innovus $1.4 million in bridge financing, and pay $1.1 million in stock to retire Innovus warrants largely held by Armistice.[36] Aytu agreed to pay Innovus stockholders additional money if Innovus's business achieved certain revenue metrics from 2019 through 2023.[37] Aytu assumed $3.5 million in debt from Innovus.[38]

A few months later, on February 12, 2020, and shortly before the stockholder vote was scheduled, the Aytu board was advised of new developments about Innovus.[39] The board learned of a significant increase in accounts payable, an increased debt load, concerns over nonpayment of key vendors, and potential termination by a service provider.[40] Aytu did not disclose this new information to

---

[34] SAC ¶ 61.

[35] *Id.* ¶ 60.

[36] *Id.* ¶¶ 51–52.

[37] *Id.* ¶¶ 52–53.

[38] *Id.* ¶ 54.

[39] *Id.* ¶¶ 67–68.

[40] *Id.* ¶ 68.

stockholders.[41]

The board considered moving the stockholder vote.[42] But the board held the vote because Boyd agreed to provide bridge financing to Innovus until its next financing.[43] Stockholders, including Armistice, approved the transaction on February 13.[44] The Innovus Transaction closed on February 14, 2020.[45]

At the same time Aytu was considering the Innovus Transaction, Aytu was negotiating an asset purchase agreement with Cerecor to purchase a portfolio of six pediatric and primary care products (the "Cerecor Transaction," and together with the Innovus Transaction, the "Challenged Transactions").[46] At the time, Armistice owned 64.3% of Cerecor's voting stock and Boyd sat on Cerecor's board.[47]

On September 30, 2019, Aytu's board met to discuss the Cerecor Transaction.[48] The board received materials about the Cerecor portfolio's historical revenues; those materials did not disclose that Cerecor had written off and abandoned sales efforts with respect to one product in the portfolio, or that Cerecor purchased four of the products less than two years earlier for nominal

---

[41] *Id.* ¶ 71.

[42] *Id.* ¶ 69.

[43] *Id.* ¶¶ 69–70.

[44] *Id.* ¶ 107.

[45] *Id.* ¶ 72.

[46] *Id.* ¶¶ 75–77.

[47] *Id.* ¶ 76.

consideration.[49]  The September 30 materials include no analyses on value or anticipated profitability.[50]  The board did not review Cerecor's public filings.[51] Despite Boyd and Armistice's knowledge of Cerecor, Boyd did not give the board any additional information.[52]

The Aytu board met again on October 10 to discuss and vote on the Cerecor Transaction; the board was informed that Boyd was "interested in the [Cerecor] Transaction."[53]  Meeting materials failed to disclose that the Cerocor portfolio was unprofitable, and that one of the products was discontinued.[54]

The Aytu board approved the Cerecor Transaction.[55]  Boyd did not recuse himself from the vote.[56]  The Aytu board did not retain a financial advisor or receive a fairness opinion.[57]

Aytu purchased the portfolio for a cash payment of $4.5 million and issued Aytu convertible preferred stock to Cerecor stockholders, valued at $12.5

---

[48] *Id.* ¶ 87.

[49] *Id.* ¶¶ 87–88.

[50] *Id.* ¶ 89.

[51] *Id.* ¶ 88.

[52] *Id.*

[53] *Id.* ¶¶ 90–92.

[54] *Id.* ¶ 94.

[55] *Id.* ¶ 90.

[56] *Id.* ¶ 92; Kappauf Aff. Ex. E at -3004, -3008.

[57] SAC ¶¶ 81, 95.

million.[58]  Aytu also assumed certain Cerecor financial and royalty obligations.[59] The Cerecor Transaction closed on November 1.[60]

Through the Challenged Transactions, Armistice nearly tripled its Aytu stake.[61]

### C.  Goodwill

In the months after the Challenged Transactions, Aytu wrote off millions of dollars in goodwill from the Cerecor Transaction.[62]  Aytu initially recorded $8.4 million in goodwill from the Innovus Transaction; that number increased to $8.6 million by the end of 2020.[63]  And as of December 2019, Aytu recorded $15.4 million in goodwill from the Cerecor Transaction;[64]  by June 2020, that number increased to $19.5 million.[65]  In June 2021, Aytu disclosed it had "concluded that [it] had a material weakness in internal control over financial reporting related to [its] analysis for the accounting of goodwill and other intangibles and accounting

---

[58] *Id.* ¶ 78.

[59] *Id.* ¶¶ 79–80.

[60] *Id.* ¶ 96.

[61] *Id.* ¶ 111.  Contemporaneously with the Cerecor Transaction, Armistice entered into a private placement offering with Aytu to purchase Series F Convertible Preferred Stock. *Id.* ¶¶ 98–101.

[62] *Id.* ¶¶ 113, 122–23.

[63] *Id.* ¶ 117.

[64] *Id.* ¶ 115.

[65] *Id.* ¶ 116.

for impairment of longlived assets."[66]  In September 2021, Aytu disclosed it found a goodwill impairment based on its determination that the fair value of one of the Cerecor portfolios it purchased was less than the portfolios' carrying value.[67] Ultimately, Aytu wrote off the entire amount of goodwill recorded for the Cerecor Transaction.[68]

### D. Trades

Shortly after the Challenged Transactions, Armistice liquidated its holdings in Aytu.  Armistice was considered an Aytu insider and was subject to Aytu's insider trading policy (the "Insider Trading Policy").

The Insider Trading Policy defined material nonpublic information ("MNPI") to include, among other things: "news of pending or proposed acquisitions"; "news of the disposition or acquisition of significant assets"; "significant developments involving collaboration relationships"; "known but unannounced future earnings or losses"; and "new equity or debt offerings."[69]  The Insider Trading Policy imposes a special black-out period for Aytu insiders until

---

[66] *Id.* ¶ 118.

[67] *Id.* ¶ 120.

[68] *Id.* ¶¶ 121–23.  Aytu recorded $8.6 million in goodwill from the Innovus Transaction. *Id.* ¶ 117.  Plaintiff does not specifically plead Aytu wrote off any Innovus goodwill. *Id.* ¶ 113.

[69] *Id.* ¶ 134; Pl's Ex. 2 at -0251.

three days after a disclosure of material company developments.[70] The policy also prohibits insiders with MNPI from trading on that information until it has been known by the public for two days.[71] Aytu's Insider Trading Policy has a pre-clearance requirement that prohibits directors, and entities controlled by directors, from trading until:

> (i) the person trading has notified the Chief Financial Officer in writing of the amount of the proposed trade(s), and (ii) the person trading has certified to the Chief Financial Officer in writing no earlier than one business day prior to the proposed trade(s) that (a) he or she is not in possession of Material Nonpublic Information concerning the Company, and (b) the proposed trade(s) do not violate the trading restrictions of Section 16 of the Exchange Act or Rule 144 of the Securities Act.[72]

Because directors may possess MNPI about the company's financials, Aytu's policy imposes a financial information blackout period prohibiting director trading beginning ten days before the end of each fiscal quarter and ending three days after Aytu publicly discloses its quarterly financial results.[73] Lastly, the Insider Trading Policy prohibits insiders from tipping others about MNPI, or providing trading advice about Aytu securities while possessing MNPI.[74]

---

[70] SAC ¶ 144.

[71] *Id.* ¶ 145.

[72] *Id.* ¶ 147.

[73] *Id.* ¶ 154.

[74] *Id.* ¶¶ 165–66.

13

## 1. March Trades

On March 9, 2020, Disbrow advised Aytu's board that Aytu was signing an exclusive distribution agreement to commercialize a rapid COVID-19 test.[75] Aytu announced this agreement to the public the next day, March 10. Aytu's stock price jumped 400% by the end of that day.[76]

Also on March 10, Armistice sold 23.5 million shares, representing $31.2 million.[77] These sales were not made pursuant to a Rule 10b5-1 plan.[78] Before making those trades, Armistice's counsel emailed Disbrow, Aytu's CFO, and Aytu's outside counsel requesting permission to trade.[79] Disbrow confirmed Armistice was not in possession of MNPI and authorized Armistice to trade.[80]

Over the next two days, on March 11 and March 12, Aytu announced it was entering into certain financing arrangements with investors to purchase twenty-four million Aytu shares through registered direct offerings, set to close March 13.[81] Boyd knew about these arrangements before Armistice's March 10 trades.[82] By

---

[75] *Id.* ¶ 131.

[76] *Id.* ¶ 135.

[77] *Id.* ¶¶ 129, 136.

[78] *Id.* ¶ 142.

[79] *Id.* ¶ 148.

[80] *Id.* ¶ 149.

[81] *Id.* ¶ 137.

[82] *Id.* ¶ 138.

14

March 13, Aytu's stock price fell by 44%.[83]

## 2. April Trades

On April 27, Armistice emailed Disbrow, and Aytu's CFO and outside counsel, requesting clearance to trade.[84] Disbrow gave Armistice the go-ahead.[85] Later that day, Armistice liquidated the rest of its stock (together with the March trades, the "Trades").[86] Under Aytu's Insider Trading Policy, April 27 fell within a financial blackout period.[87]

## E. Litigation And Partial Settlement

Plaintiff filed this derivative action on September 12, 2022.[88] He amended his complaint on April 10, 2023,[89] and again on April 3, 2024 (the "Amended Complaint").[90] Plaintiff brought claims against Armistice and Boyd for breach of fiduciary duty, aiding and abetting, and unjust enrichment, and against certain current and former Aytu directors and officers (the "Directors") for breach of fiduciary duty, aiding and abetting, and unjust enrichment.

On March 13, 2024, Plaintiff and the Directors entered into a Stipulation and

---

[83] *Id.* ¶ 140.

[84] *Id.* ¶¶ 159–60.

[85] *Id.* ¶ 161.

[86] *Id.* ¶¶ 150–52.

[87] *Id.* ¶¶ 156–57.

[88] D.I. 1.

[89] D.I. 13.

[90] *See* SAC.

Agreement of Settlement, Compromise, and Release to settle all claims against them (the "Settlement").[91]  I approved that settlement on January 13, 2025.[92]  As part of the Settlement, Plaintiff voluntarily dismissed Boyd from this action.[93]  In the Settlement, Aytu agreed to maintain a position of neutrality with respect to the derivative claims against Armistice.[94]

Armistice is the sole remaining defendant.  Plaintiff presses claims against Armistice for breach of fiduciary duty as to the Challenged Transactions, breach of fiduciary duty as to the Trades, aiding and abetting breach of fiduciary duty, and unjust enrichment.

## II.  ANALYSIS

Armistice seeks dismissal of this action under Court of Chancery Rule 23.1 for failure to plead demand futility and under Rule 12(b)(6) for failure to state a claim.  The facts here "are drawn from the operative complaint, the documents

---

[91] D.I. 27; SAC ¶ 194.

[92] D.I. 71.

[93] D.I. 27 ¶ 22; *see also* D.I. 77 (dismissing Boyd from action per settlement).

[94] D.I. 27 ¶ 21 ("The Aytu Defendants agree that they will maintain a position of neutrality with respect to the claims asserted in the Action against the Armistice Defendants. The Aytu Defendants shall not file any motion, pleading, or other submission seeking dismissal of the claims against the Armistice Defendants pursuant to Del. Ch. Ct. R. 23.1 or otherwise. In the event the Armistice Defendants seek dismissal of the Action pursuant to Del. Ch. Ct. R. 23.1, the Aytu Defendants shall file with the Court a declaration stating that the Company neither objects to nor supports claims being brought against the Armistice Defendants on its behalf.").

16

integral to it, and those incorporated by reference."[95]  For reasons I will explain, demand is excused, and the motion to dismiss is granted.

### A.    Demand Is Excused.

I begin with demand futility.  "In a derivative suit, a stockholder seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[96]  "'In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must' (1) make a demand on the company's board of directors or (2) show that demand would be futile."[97]  Plaintiff did not bring a demand on the board, so he must show the demand requirement is excused as futile.[98]

Because Aytu has taken a position of neutrality on the claims against Armistice, demand is excused. "'A cardinal precept' of Delaware law is 'that directors, rather than shareholders, manage the business and affairs of the

[95] *Bricklayers Pension Fund of W. Pa ex rel. Centene Corp. v. Brinkley*, 2024 WL 3384823, at *2 (Del. Ch. July 12, 2024).

[96] *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034 (Del. 2021).

[97] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034, 1047 (Del. 2021) (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)).

[98] SAC ¶ 182.

corporation.'"[99]  And "[t]he board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider."[100]  The corporation's position is paramount over any court consideration of demand futility:

> When the defense of failure to make a demand is asserted, the court is required to examine the position or policy espoused by the corporation which it seeks to protect.  Therefore, before a court can apply the traditional standards for determining when demand is excused it must first examine whether the corporation on whose behalf the action is brought has taken a position concerning the propriety of the derivative litigation.  Stated differently, if the demand rule requires deference to the prerogative of management, its invocation must advance management's position, *vis-a-vis*, the claims in question, otherwise, the rule serves no function.[101]

Built on Delaware's board-centric foundation, *Kaplan v. Peat, Marwick, Mitchell & Co.* explains a company's enunciated position on a derivative claim takes precedence over the Court's Rule 23.1 assessment of the position the company might be able to take.[102]

In keeping with that precept, the Delaware Supreme Court held that "when a corporation chooses to state its position in regard to the propriety of the derivative

---

[99] *Zuckerberg II*, 262 A.3d at 1047 (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds* 746 A.2d 244 (Del. 2000)).

[100] *Zuckerberg II,* 262 A.3d at 1047.

[101] *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 731 (Del. 1988).

[102] *Id.*

18

litigation it must do so affirmatively. A position of neutrality is viewed as inconsistent with objection to the continued prosecution of the derivative action and thus serves to excuse demand."[103] In *Kaplan*, the company stated it "neither objects to nor supports" the derivative action brought on its behalf by stockholders.[104] The high court explained that "a corporation's failure to object to a suit brought on its behalf must be viewed as an approval for the shareholders' capacity to sue derivatively."[105]

Under *Kaplan*, Aytu's position of neutrality excuses demand for the claims against Armistice. Aytu committed to a position of neutrality with regard to Plaintiff's claim against Armistice.[106] *Kaplan* tells us Aytu's stance must be viewed as approval for Plaintiff to sue Armistice derivatively.[107]

Armistice does not dispute that interpretation of Aytu's stance.[108] Rather, Armistice argues a statement of neutrality made in connection with a settlement

---

[103] *Id.* at 727.

[104] *Id.* at 729.

[105] *Id.* at 731; *see also Envirokare Composite Corp. v. D&D Mfg., LLC*, C.A. No. 2022-1202-KSJM, at 27 (Del. Ch. Mar. 6, 2024) ("LRM's position of neutrality excuses Plaintiff's failure to make a demand. So the Rule 23.1 argument does not pass 'Go.'") (TRANSCRIPT).

[106] SAC ¶ 200.

[107] *Kaplan*, 540 A.2d at 731.

[108] And Armistice made clear that "[i]n making [its] argument, Armistice does not seek to undermine or overturn the Settlement between Aytu and Plaintiff." Defs. Supp. at 8 n.3.

should not, as a policy matter, permit a plaintiff to bypass Rule 23.1.[109] Armistice stresses that a "position of neutrality thus becomes a bargaining chip" or a "weapon" to "avoid the otherwise imperative standing obligation."[110] In Armistice's view, this "defies the policy underlying Rule 23.1's demand requirement."[111]

At bottom, Armistice is asking the Court to disregard the board's decision that Plaintiff can pursue Aytu's claim against Armistice, and make the Court's own Rule 23.1 determination, because Aytu enunciated that position after negotiating with Plaintiff. Asking the Court to substitute its judgment for a board's is a big ask. Doing so requires some reason to doubt the board's competence, loyalty, or independence; Armistice offers none.[112] Whether Plaintiff extracted that statement

---

[109] *See generally* Defs. Supp.

[110] *Id*. at 8.

[111] *Id*. at 3.

[112] "[T]he 'business judgment rule' is '[a]t the foundation' and '[a]t the core of Delaware corporate law.'" *Binks v. DSL.net, Inc.*, 2010 WL 1713629, at *5 (Del. Ch. Apr. 29, 2010) (first quoting *Disney v. Walt Disney Co.,* 2005 WL 1538336, at *4 (Del. Ch. June 20, 2005); and then quoting *In re CompuCom Sys., Inc. S'holders Litig.,* 2005 WL 2481325, at *5 (Del. Ch. Sept. 29, 2005)). "[T]he business judgment rule serves to promote the role of the board, and not the court, as the ultimate manager of the business and affairs of the corporation." *CompuCom*, 2005 WL 2481325, at *5; *see also Solash v. Telex Corp.*, 1988 WL 3587, at *8 (Del. Ch. Jan. 19, 1988) ("Because businessmen and women are correctly perceived as possessing skills, information and judgment not possessed by reviewing courts and because there is great social utility in encouraging the allocation of assets and the evaluation and assumption of economic risk by those with such skill and information, courts have long been reluctant to second-guess such decisions when they appear to have been made in good faith.").

of neutrality, rather than the board providing it in its loyal and informed business judgment, is not plain from the face of the Settlement; inferring that would be an improper defense-friendly inference. At bottom, Armistice asks the Court to elevate Rule 23.1 over the board's decision. But the point of Rule 23.1 is to ensure the directors "control the legal rights of the corporation unless there is a basis for excusing their control."[113] When the board has ceded control, there is no reason for the Court to ask if it should have control.[114]

Finally, the mere fact that the company's position appears in a settlement agreement does not support the Court substituting its judgment for the company's.

---

Still, one way to read the Settlement is as an exchange of a statement of neutrality toward Armistice for a release of claims against the Directors (and dismissal of Boyd): throwing Armistice to a stockholder plaintiff in exchange for peace at home. I make no comment on the loyalty of any such exchange, nor do I consider if or how the Court might probe whether a statement of neutrality—promoting monetization of a derivative claim—should be disregarded as wrongful because it bought a release for directors. *See, e.g.*, *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786–89 (Del. 1981) (concluding a special litigation committee's decision to dismiss demand-excused derivative litigation presents sufficient risk of disloyalty to warrant judicial evaluation, and establishing a framework); *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2017 WL 5565264, at *4 (Del. Ch. Nov. 20, 2017). My holding today is limited to Armistice's argument that a statement of neutrality offered to a plaintiff in a settlement allows that plaintiff to bypass Rule 23.1's demand requirements and should be disregarded because of it. *See* OB 52 (briefly noting "procedural implications" of "us[ing] 'demand neutrality' as a settlement bargaining chip to escape [Plaintiff's] demand obligations"); RB 29 (arguing the statement should be disregarded because at that time the settlement had not yet been approved); Defs. Supp. 7–10 (arguing that a statement of neutrality offered as a central settlement term improperly allows plaintiffs to bypass demand futility requirements).

[113] *In re Am. Intern. Gp, Inc.*, 965 A.2d 763, 810 (Del. Ch. 2009).

[114] *Id.* at 811.

In the settlement context, Delaware's board-centric governance model dovetails with two more foundational precepts. First, "Delaware is famously contractarian."[115] "We 'uphold[] the freedom of contract and enforce[] as a matter of *fundamental public policy* the voluntary agreements of sophisticated parties.'"[116] And second, "Delaware law, as a general proposition, favors the voluntary settlement of contested issues."[117] When a board pronounces its neutrality as to a derivative action in a settlement agreement, these precepts favor respecting that neutrality, not overriding it. Demand is excused.

### B. Court of Chancery Rule 12(b)(6)

Next, I turn to Rule 12(b)(6). In a ruling on a motion to dismiss under Rule 12(b)(6),

> the Court accepts as true all well-pled factual allegations contained in the amended complaint, but conclusory statements–those unsupported by well-pled factual allegations–are not accepted as true. The Court will draw all inferences logically flowing from the amended complaint in favor of the plaintiff but only if such inferences are reasonable. The Court will not dismiss under Rule 12(b)(6) any claim unless it appears to a reasonable certainty that the plaintiff cannot prevail on any set of facts which might be proven to support the

---

[115] *Fortiline, Inc. v. McCall*, 2025 WL 1783560, at *3 (Del. Ch. June 27, 2025).

[116] *Cantor Fitzgerald, L.P. v. Ainslie*, 312 A.3d 674, 688–89 (Del. 2024) (quoting *NAF Hldg., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (Del. 2015)).

[117] *Kahn v. Sullivan*, 594 A.2d 48, 58 (Del. 1991); *see also Citron v. Burns*, 1985 WL 11533, at *2 (Del. Ch. Feb. 4, 1985) ("To begin with, there is a policy favoring such settlements in the interest of judicial economy.").

allegations in the amended complaint.[118]

Armistice has moved to dismiss Counts I and II for breach of fiduciary duty, Count III for unjust enrichment, and Count VII for aiding and abetting.[119]  I grant the motion in full.

### 1.  Armistice Is Not A Controlling Stockholder.

First, I turn to Plaintiff's claim for breach of fiduciary duty in connection with the Challenged Transactions.  Plaintiff asserts Armistice breached its fiduciary duties "by causing Aytu to enter into transactions that benefitted . . . [Armistice] and were not in the best interest of [Aytu] or its minority stockholders."[120]  A threshold question is whether Armistice owed fiduciary duties. I find it did not.

"As a general rule, stockholders do not owe fiduciary duties to the corporation or its stockholders and are free to act in their self-interest."[121]  But "Delaware law imposes fiduciary duties on those who effectively control a

---

[118] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart* (*Beam I*), 833 A.2d 961, 970 (Del. Ch. 2003) (footnote omitted), *aff'd*, 845 A.2d 1040 (Del. 2004).

[119] *E.g.*, OB 19–21.

[120] SAC ¶ 205.  "Because the [Aytu] board had the opportunity to consider whether to move to dismiss this litigation or take charge of it but instead . . . opted to take no position, the appropriate metric by which to measure whether the [c]omplaint survives is the Rule 12(b)(6) standard, not the Rule 23.1 standard." *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 881 n.13 (Del. Ch. 2009), *aff'd sub nom. Teachers' Ret. Sys. of La. v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010) (TABLE).

[121] *In re Oracle Corp. Deriv. Litig.* (*Oracle II*), -- A.3d --, 2025 WL 249066, at *11 (Del. Jan. 21, 2025).

23

corporation."[122]  "[A] stockholder who owns or controls over 50% of a Delaware corporation's stock is presumed to exercise 'hard' control and assumes fiduciary duties in certain circumstances.  This is because a majority stockholder controls the levers of power within the corporation."[123]  "Conversely, a stockholder who owns or controls less than 50% of a corporation's voting power is not presumed to be a controlling stockholder with fiduciary duties."[124]  "Under recent Delaware Supreme Court precedent, a minority stockholder may exercise actual control (i) 'over the corporation's business and affairs' or (ii) 'over a specific transaction.'"[125]  Here, Plaintiff asserts Armistice exercised actual control over the Challenged Transactions.[126]

"The test for actual control by a minority stockholder 'is not an easy one to satisfy.'"[127]  "To allege transaction-specific control, a plaintiff must plead facts supporting the inference that a stockholder 'exercised actual control over the board

[122] *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014).

[123] *Oracle II*, 2025 WL 249066, at *11 (footnote omitted).

[124] *Id.* at *12.

[125] *Frank v. Mullen*, 337 A.3d 824, 837 (Del. Ch. May 5, 2025) (quoting *Oracle II*, 2025 WL 249066, at *12).

[126] As I recently noted in *Frank v. Mullen*, "[w]hether Delaware law has or should have recognized transaction-specific control is subject to a lively debate before the judiciary and in academia."  337 A.3d at 837 n.141.  For purposes of this opinion, I "proceed[] under recent Delaware Supreme Court precedent recognizing that 'a minority stockholder can be a controlling stockholder by exercising actual control . . . over a specific transaction.'"  *Id.* (quoting *Oracle II*, 2025 WL 249066, at *12).

of directors during the course of a particular transaction.'"[128] "[T]he *potential* ability to exercise control is not sufficient."[129] "At the pleadings stage, a reasonable inference of actual control rests on the totality of the facts and circumstances considered in the aggregate."[130] Indeed, "there is no magic formula to find control; rather, it is a highly fact specific inquiry."[131] Plaintiff has failed to allege facts supporting an inference that Armistice conceivably "dominated or controlled [the Board's] 'corporate decision-making process[.]'"[132]

Plaintiff pleads the following indicia of control[133]:

- Armistice's 41% stake in Aytu;[134]

---

[127] *Oracle II*, 2025 WL 249066, at *12 (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

[128] *Frank*, 337 A.3d at 837–38 (quoting *Oracle II*, 2025 WL 249066, at *12).

[129] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006).

[130] *Sciannella v. AstraZeneca UK Ltd.*, 2024 WL 3327765, at *17 (Del. Ch. July 8, 2024), *aff'd*, 2025 WL 946148 (Del. Mar. 26, 2025).

[131] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016).

[132] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *11 n.66 (Del. Ch. Oct. 24, 2014)).

[133] Witmer sees another sign of control in Boyd brokering the Tris deal before he was an Aytu director. SAC ¶¶ 27–28. I fail to see how Boyd brokering that deal provides any support for an inference of actual control over the board with respect to the Challenged Transactions a year later. I focus on Witmer's more salient allegations.

[134] *Id.* ¶ 40. The parties dispute the size of Armistice's relevant holdings. Plaintiff pleads that by spring 2019 "Armistice held 41.1% of the Company's outstanding shares" and as of January 2020, it held 40.4%. *Id.* ¶¶ 40, 104. Citing to Aytu's December 2019 Schedule 14A, Armistice says that it owned only 28% of Aytu's stock as of December 2019. OB 23; Kappauf Aff. Ex. D at 1. Armistice says Plaintiff improperly contributes

25

- Armistice's ownership in Innovus and Cerecor[135];
- Boyd's membership on the board and Review Committee[136];
- the process surrounding the Challenged Transactions;[137]
- Boyd's business relationship with Disbrow;[138] and
- Aytu's disclosure that "Armistice could be able to exert significant control."[139]

I will consider each factor in turn before evaluating them holistically.

### i. Ownership Stake

First, Armistice's stake. Our control jurisprudence "do[es] not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder. Instead, the scatter-plot nature of [prior] holdings highlights the importance and fact-intensive nature of the actual control factor."[140] Armistice's less-than-fifty-percent stake in Aytu does not demonstrate control in itself.[141] Nor does Armistice's stake in Innovus and Cerocor.[142] More is required.

---

nonvoting stock toward his control analysis. RB 2–3, 12–13. For this motion only, I will assume the larger number.

[135] SAC ¶¶ 46, 75–76; AB 44.

[136] SAC ¶ 61; AB 14, 44.

[137] SAC ¶¶ 238–39.

[138] *Id.* ¶ 26; AB 9–10.

[139] SAC ¶ 42.

[140] *Crimson Expl.*, 2014 WL 5449419, at *10 (collecting cases).

[141] *Oracle II*, 2025 WL 249066, at *11.

[142] Armistice's benefit from the Challenged Transactions may mean Armistice had motive to exert control, but allegations of actual control are still needed. *Crimson Expl.*,

### ii.      Process-Based Arguments

"Process inquiries are fact-intensive.  Evaluating process integrity for the purpose of determining actual control considers all 'possible sources of influence' and '[b]roader indicia of effective control.'"[143]  Boyd's mere presence while the seven-member Aytu board discussed the Challenged Transactions, without any allegation that his presence slanted discussion or cowed directors, offers no support for an inference of control.[144]

Plaintiff has not pled that Boyd participated in either Challenged Transaction's process in any way that tainted the process or affected the outcome.  In connection with the Innovus Transaction, Boyd's alleged conduct is limited to

---

2014 WL 5449419, at *16 (explaining a plaintiff must "allege facts to show that the [investor] actually controlled the board's decision about the transaction at issue.").

[143] *Frank*, 337 A.3d at 846 (footnoted omitted) (quoting *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *26–27 (Del. Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019) (TABLE)).

[144] SAC ¶¶ 61, 91–92; *see In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *17 (Del. Ch. Nov. 30, 2021) ("The presence of Armistice designees Boyd and Maher on the Board does not establish control.  Boyd and Maher constituted two of the eight directors on the Board at the time of the challenged transactions and as of the filing of the operative Complaint.  Neither of them is an officer of Vaxart and neither of them is alleged to have taken action to exert control over Vaxart's affairs or any of the challenged transactions."); *see also Turnbull v. Klein*, 2025 WL 353877, at *14 (Del. Ch. Jan. 31, 2025); *Patel v. Duncan*, 2021 WL 4482157, at *14 (Del. Ch. Sept. 30, 2021) (holding a stockholder's "representatives' passive presence at Board meetings discussing the Challenged Transaction" did not support an inference of control, noting the "stark contrast" to other cases "where the alleged controllers were deeply involved in negotiating and structuring the challenged transactions"), *aff'd*, 277 A.3d 1257 (Del. 2022) (TABLE).

27

his inclusion on the Review Committee. The Review Committee was a "special committee" that "reviewed the proposed" terms of the Innovus Transaction before they were presented to the full board.[145] Plaintiff does not plead that the Review Committee was empowered in any manner to negotiate, recommend, or approve the Innovus Transaction.[146] As pled, the Review Committee was not empowered to do much at all. Boyd "reviewed" the potential terms before the full board did the same. As to the Cerecor Transaction, Plaintiff provides even less about Boyd's conduct,[147] alleging only his presence at board meetings.

From there, Plaintiff simply finds fault in Aytu's board's process. Plaintiff asserts the board rubberstamped both Challenged Transactions,[148] and received inadequate information about both companies' finances and value.[149] And he points to the lack of fairness opinions, advisors, or "meaningful analysis, or negotiation[.]"[150] While Plaintiff's complaints may touch on competence, they do not touch on control.

---

[145] SAC ¶ 61.

[146] *Cf. Rouse Props.*, 2018 WL 1226015, at *12 (explaining a plaintiff demonstrates control if she pleads the stockholder "actually dominated and controlled . . . the deciding committee with respect to the challenged transaction").

[147] SAC ¶¶ 81–95.

[148] *Id.* ¶¶ 55, 86.

[149] *Id.* ¶¶ 57–60, 67–71, 86–89, 92–95.

[150] *Id.* ¶¶ 55, 67–68, 95.

"Critically, the Amended Complaint does *not* allege that [Armistice] 'steered the negotiations or otherwise dominated' the Board," and includes almost no allegations about Boyd's conduct, "let alone the type of 'overt or even subtle bullying' that this Court has found to support a reasonable inference of control."[151]

### iii. Control Over Disbrow

Plaintiff also asserts Disbrow was not independent of Armistice because of his business relationship with Boyd. First, even accepting this argument as true, Disbrow was one of seven board members – far from a majority of the board required to plead dominion.[152]

---

[151] *Turnbull*, 2025 WL 353877, at \*14 (Del. Ch. Jan. 31, 2025) (first quoting *Flannery v. Genomic Health, Inc.,* 2021 WL 3615540, at \*15 (Del. Ch. Aug. 16, 2021); and then quoting *Larkin v. Shah*, 2016 WL 4485447, at \*15 (Del. Ch. Aug. 25, 2016)); *see In Re: Sea-Land Corp. S'holders Litig.,* 1987 WL 11283, at \*1–2, 5 (Del. Ch. May 22, 1987) (finding control not well-pled despite 39.5% stockholder's attendance at board meetings).

[152] SAC ¶¶ 17–22, 61 n.2; s*ee Frank*, 337 A.3d at 845; *Calesa Assocs.*, 2016 WL 770251, at \*12 (denying motion where the plaintiffs "pled sufficient facts to support a reasonable inference that a majority of the Board was not disinterested or lacked independence from [the stockholder], such that [the stockholder] was a controlling stockholder at the time of the Transaction."); *Thermopylae Cap. P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at \*14 (Del. Ch. Jan. 29, 2016) (explaining a stockholder can exercise control over a decision if it "achieved control or influence over a majority of directors through non-contractual means, such as affiliation or aligned self-interest"); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) ("The fact that two employees of [a 27.7% stockholder] sat on the board, without more, does not establish actual domination of the board, especially given that there were eight directors not affiliated with [the 27.7% stockholder].").

To the extent Plaintiff challenges the independence of other Aytu directors because "Boyd and Armistice concentrate their investment activities in the same industry" those directors work in, that challenge fails. SAC ¶ 189; *see, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart* (*Beam II*), 845 A.2d 1040, 1051–52 (Del. 2004) ("Mere allegations that they move in the same business and social circles . . .

And Plaintiff fails to dislodge the presumption that Disbrow was independent. "Directors are presumed to be independent. To carry their burden, a plaintiff must sufficiently plead that a director's ties to the interested party, when judged subjectively, were material such that those ties could have affected that director's impartiality. These ties are viewed holistically."[153] Plaintiff asserts only that Disbrow and Boyd worked together, and one previous business dealing. Specifically, he asserts: (1) Boyd was a "confidante and advisor" to Disbrow, "with the two frequently consulting privately about [Aytu's] financial position and business strategy,"[154] (2) Boyd assisted Disbrow in arranging financing arrangements for Aytu,[155] and that (3) while sitting on the Cerecor board in 2018, Boyd directed the Tris Deal to Disbrow and Aytu.[156] Those business connections

---

is not enough to negate independence for demand excusal purposes."); *Newman v. KKR Phorm Invs., L.P.*, 2023 WL 5624167, at *5 (Del. Ch. Aug. 31, 2023) (finding "[t]he Amended Complaint fails to rebut the presumption of independence" where it "alleges no facts suggesting that [defendant stockholder] 'controlled' the [Review Committee] or 'dominated' them through a 'close relationship' or 'force of will.'" (quoting *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. March 1, 2002))).

[153] *Ligos v. Tsuff*, 2022 WL 17347542, at *7 (Del. Ch. Nov. 30, 2022); *In re HomeFed Corp. S'holder Litig.*, 2020 WL 3960335, at *14 (Del. Ch. July 13, 2020) ("Although the presence of a controller does not alone overcome the presumption of director independence, it is relevant when considering Plaintiffs' allegations holistically.").

[154] SAC ¶ 26.

[155] *Id.* ¶¶ 133, 138.

[156] *Id.* ¶¶ 30–31.

do not disturb Disbrow's independence.[157]

### iv.    Aytu's Disclosure

Finally, Aytu's disclosure that Armistice could generally exert control is not enough to plead control over the Challenged Transactions. In 2019, Aytu disclosed that "[t]he significant ownership interest Armistice has" and "Boyd's position on [the] board of directors *could* give Armistice the ability to influence [Aytu] through their ownership positions" and that "Armistice *could* be able to exert significant control over [Aytu]."[158]

A company's public acknowledgment of control or outsized influence is an indicator of control.[159] But "Delaware law requires actual control, not merely the potential to control."[160] It follows that a disclosure of the mere possibility of control does not amount to actual control, without more.

---

[157] *E.g.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 648–49 (Del. 2014) ("Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction or the person they are investigating are not enough to rebut the presumption of independence."), *abrogated on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018); *Beam II*, 845 A.2d at 1051–52.

[158] Aytu Bioscience, Inc., Annual Report (Form 10-K) (Sept. 26, 2019) (emphases added); SAC ¶ 42.

[159] *See In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *19 (Del. Ch. Mar. 28, 2018); *Rouse Props.*, 2018 WL 1226015, at *19; *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *6–8 (Del. Ch. Nov. 26, 2014), *rev'd on other grounds sub nom.*, *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173 (Del. 2015).

[160] *Williamson*, 2006 WL 1586375, at *5; *see also Citron v. Steego Corp.*, 1988 WL 94738, at *6 (Del. Ch. Sept. 9, 1988) ("[I]t is the actual exercise of such control, not the simple potential for control, that creates the special duty.").

Plaintiff relies on *In re Zhongpin Inc. Stockholders Litigation*.[161] In *Zhongpin*, the company expressly admitted the defendant was its controller, and confirmed he had "significant influence," that the company relied on him to "manage [their] operations," and that if he left, it would have a "material adverse effect on [the company's] business and operations."[162] The Court found that disclosure, along with other allegations in the complaint, supported a pleading stage inference that the defendant possessed latent and active control over the company's business and affairs generally.[163]

This Court has acknowledged the importance of *Zhongpin*'s "outright admission" of control, absent here.[164] And here, Boyd was not deeply involved in Aytu's business.[165] Boyd was not an executive or consultant with Aytu; he was an

---

[161] 2014 WL 6735457, at *7–8; AB 42.

[162]*Zhongpin*, 2014 WL 6735457, at *7–8.

[163] *Id*. at *9.

[164] *Rouse Props.*, 2018 WL 1226015, at *19 (explaining that "Rouse's disclosure in its 2014 Form 10–K that '[o]ur substantial stockholder may exert influence over us that may be adverse to our best interests and those of our other stockholders' is a far cry from the outright admission that a minority blockholder was the corporation's 'controlling stockholder'").

[165] *Tesla Motors*, 2018 WL 1560293, at *19 (distinguishing *Zhongpin* because the company did not "expressly concede[]" control, and noting that "if the public disclosures were all that Plaintiffs could point to as evidence of Musk's control, the pleading likely would come up short").

investor's board designee who made some substantive contributions. Boyd was one of seven directors when the Challenged Transactions were approved.[166]

And finally, even in a combination of all factors, I find Plaintiff has not pled actual control. "Whether a constellation of facts supports an inference of control is a fact-specific inquiry, and different constellations of facts can lead to different outcomes."[167] Here, the constellation of facts does not demonstrate control. While Armistice held a large stake in Aytu, it did not control the board, dictate its decision making, or compel the challenged outcomes. Armistice, for example, did not hold board veto power,[168] hold "day-to-day managerial supremacy,"[169] threaten the board,[170] or hold any other lever of control over Aytu's board, at all or for purposes of the Challenged Transactions. Armistice was a significant investor with a board designee, who had also invested in products Aytu's majority-

---

[166] SAC ¶¶ 17–22, 61 n.2.

[167] *Voigt v. Metcalf*, 2020 WL 614999, at *22 (Del. Ch. Feb. 10, 2020).

[168] *Williamson*, 2006 WL 1586375, at *4–5 (finding control well-pled where stockholders were the company's "only significant customers" and held "significant leverage" over the company, held board veto power, and placed designees on the board).

[169] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 552 (Del. Ch. 2003) (determining post-trial that a stockholder was a controller because he was the chairman, CEO, founder, and "inspirational force" behind the company, exercised "day-to-day managerial supremacy," was "involved in all aspects of the company's business," and had multiple family members as company executives).

[170] *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 913 (Del. Ch. 1999) (finding sufficient allegations of control over a merger where the stockholder owned 49% of the company, held an option to purchase another 2%, owned substantially all the company's debt, and where the company reduced the merger price after the stockholder threatened it would not consummate the merger unless there was a reduction).

independent board decided to acquire.  That is all.

## 2. *Brophy*

Plaintiff next asserts a *Brophy* claim:  he alleges Armistice breached its fiduciary duties by trading on MNPI.[171]  I disagree on the grounds that Armistice did not owe fiduciary duties.

"[A] plaintiff seeking to prevail on a *Brophy* claim ultimately must show that:  1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information."[172]  Once again, the threshold inquiry is whether Armistice owed fiduciary duties.

Plaintiff's *Brophy* theory does not assert Aytu owed fiduciary duties because it was a controller.[173]  He argues a different pathway to fiduciary status.  He asserts

---

[171] SAC ¶ 208–14.

[172] *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd sub nom. In re Oracle Corp. Deriv. Litig.*, 872 A.2d 960 (Del. 2005) (TABLE).

[173] Plaintiff's theory that Armistice owed fiduciary duties because it exerted transaction-specific control over the board for purposes of the Challenged Transactions does not extend to the Trades.  *See Oracle II*, 2025 WL 249066, at *12 (explaining a stockholder can show "actual control over a specific transaction" if the investor "exercised actual control over the board of directors during the course of a particular transaction." (quoting *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *20 (Del. Ch. May 22, 2000))).  The idea of imposing fiduciary duties based on control over a board for purposes of a trade is not intuitive to me; I suppose a plaintiff could argue in good faith that a stockholder controlled a board's approval of a trade.  Plaintiff did not attempt to

Armistice owed fiduciary duties because it possessed, through Boyd, Aytu's confidential information.[174] Plaintiff offers no Delaware law supporting his theory.

"Fiduciary duties arise from the separation of ownership and control. The essential quality of a fiduciary is that she controls something she does not own."[175] It follows that "[d]uties of a fiduciary character will only be imposed where the relationship or trust can be characterized as 'special;' fiduciary duties will not be imposed in the midst of typical arms-length business relationships."[176] "A fiduciary relationship exists where one party places a special trust in another and relies on that trust, or where a special duty exists for one party to protect the interests of another."[177] "A fiduciary relationship implies a dependence, and a

---

argue actual control over the Trades. *See* AB 38–47. Indeed, Aytu's board had no role in approving them. SAC ¶¶ 148, 159.

[174] SAC ¶¶ 211 ("[Aytu's] MNPI [wa]s an asset belonging to the Company, which Defendant Boyd and the Armistice Defendants used for their own benefit when Armistice sold its holdings of the Company's stock."); AB 38 ("[W]hether or not Armistice was a controlling stockholder is beside the point for purposes of Defendants' fiduciary duties under Brophy, which arise from access to MNPI, and do not require any showing of control."); AB 39–40 ("Here, Defendants indisputably had access to Aytu's MNPI through Boyd's position on the Board and role as Armistice's Chief Investment Officer responsible for making investment decisions. Accordingly, Brophy, Defendants occupied a 'position of trust and confidence' that gives rise to fiduciary duties with respect to their trading of Aytu securities." (citation omitted)).

[175] *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *40 (Del. Ch. May 6, 2021) (footnote omitted).

[176] *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1058 (Del. Super. Ct. 2001) (quoting *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del. Ch. 1987)).

[177] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624–25 (Del. Ch. April 1, 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

condition of superiority, of one party to another."[178]  "It generally requires 'confidence reposed by one side and domination and influence exercised by the other.'"[179] Traditional corporate fiduciaries like officers, directors, and controlling stockholders control a corporation that stockholders own, and so owe fiduciary duties.[180] From there, where control is separated from ownership, "Delaware law has acknowledged various relationships as proper fiduciary relationships, for example: attorney and client, general partners, administrators or executors, guardians, and principals and their agents."[181]

---

[178] *Id.* at 624.

[179] *Id.* (quoting *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.,* 2004 WL 1739522, at *8 n.62 (Del. Ch. Aug. 3, 2004)).

[180] *Oracle II*, 2025 WL 249066, at *11 (explaining that majority stockholders owe fiduciary duties because they "control[] the levers of power within the corporation"); *Schoon v. Smith*, 953 A.2d 196, 206 (Del. 2008) (noting that fiduciary "duties stem in part from the quasi-trustee and agency relationship directors have to the corporation and stockholders that they serve"); *Cahall v. Lofland*, 114 A. 224, 228 (Del. Ch. 1921) (explaining that "directors and officers of a corporation are stewards, or trustees, for the stockholders, and their acts are to be tested as such according to the searching, drastic and far–reaching rules of conduct which experience has found to be salutary to protect the trust beneficiaries"), *aff'd*, 118 A. 1 (Del. 1922).

[181] *Bird's Const. v. Milton Equestrian Ctr.*, 2001 WL 1528956, at *4 (Del. Ch. Nov. 16, 2001). Black's Law Dictionary defines "fiduciary relationship" as follows: "A relationship in which one person is under a duty to act for the benefit of another on matters within the scope of the relationship – such as trustee-beneficiary, guardian-ward, principal-agent, and attorney-client – require an unusually high degree of care. Fiduciary relationships usu[ally] arise in one of four situations: (1) when one person places trust in the faithful integrity of another, who as a result gains superiority or influence over the first, (2) when one person assumes control and responsibility over another, (3) when one person has a duty to act for or give advice to another on matters falling within the scope of the relationship, or (4) when there is a specific relationship that has traditionally been recognized as involving fiduciary duties, as with a lawyer and a client or a stockbroker and a customer." *Fiduciary Relationship*, Black's Law Dictionary (12th ed. 2024).

Plaintiff excavates the foundation of fiduciary duties altogether, asserting Armistice need not exert any control over Aytu to owe them.[182] Plaintiff asserts that because Armistice "indisputably had access to Aytu's MNPI through Boyd's position on the Board,"[183] Armistice "occupied a 'position of trust and confidence' that gives rise to fiduciary duties with respect to their trading of Aytu securities."[184]

Plaintiff relies on three cases as support for his theory: *Brophy v. Cities Service Co.*,[185] *Triton Construction Co. v. East Shore Electric Services, Inc.*,[186] and *In re Fitbit, Inc. Stockholder Derivative Litigation*.[187] They do not support imposing fiduciary duties based on mere access to confidential information.

In *Brophy*, the defendant was a fiduciary because he was a company employee in a position of trust and confidence, and obtained confidential information through that position. After the company's confidential secretary learned through his employment that the company intended to repurchase company shares, the secretary traded on that information.[188] A stockholder brought a

---

[182] AB 38 (asserting "whether or not Armistice was a controlling stockholder is beside the point for purposes of [its] fiduciary duties under Brophy, which arise from access to MNPI, and do not require any showing of control").

[183] *Id*. 39.

[184] *Id*. at 40.

[185] 70 A.2d 5 (Del. Ch. 1949).

[186] 2009 WL 1387115 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010).

[187] 2018 WL 6587159 (Del. Ch. Dec. 14, 2018); AB 38–40.

[188] *Brophy*, 70 A.2d at 7.

derivative claim, arguing a constructive trust should be placed on the secretary's profits.[189] The Court determined the secretary was a fiduciary. The secretary did not owe fiduciary duties that restricted his right to sell merely because he had access to confidential information.[190] Nor did he owe fiduciary duties merely because of his employment status.[191] The duties arose from the combination of his position within the company, which was a "position of trust and confidence," and access to confidential information acquired in the course of that employment.[192]

Armistice was not an Aytu employee. Armistice was not in a position of trust and confidence; as explained, Armistice was not a controller. And while Boyd is an Aytu fiduciary, and learned confidential information during his

---

[189] *Id.*

[190] *Id.* (explaining that "by reason of [his] employment as an executive and as the confidential secretary to an officer and director of [the company] he occupied a position of trust and confidence toward the corporation, *with respect to the information so acquired*" (emphasis added)); *see also Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 837 (Del. 2011) (noting that in *Brophy*, "[b]ecause the employee defendant occupied a position of trust and confidence within the plaintiff corporation, the court found his relationship analogous to that of a fiduciary").

[191] *Brophy*, 70 A.2d at 7 ("A mere employee, not an agent with respect to the matter under consideration, does not ordinarily occupy a position of trust and confidence toward his employer."); *id.* at 8 ("[I]n the absence of special circumstances, corporate officers and directors may purchase and sell its capital stock at will, and without any liability to the corporation. Ordinarily an employee has the same rights.")

[192] *Id.* at 8; *id.* at 7 ("But if an employee in the course of his employment acquires secret information relating to his employer's business, he occupies a position of trust and confidence toward it, analogous in most respects to that of a fiduciary, and must govern his actions accordingly.").

38

directorship, neither is true for Armistice.[193] *Brophy* does not support imposing

fiduciary duties on Armistice that would restrict Armistice's right to sell.

*Triton* does not help Plaintiff either.[194] It considered whether an employee

breached fiduciary duties owed to the company employer by performing work for

its direct competitor and usurping the employer's business opportunities.[195] The

Court recognized that fiduciary duties flow from an agency relationship.[196] It also

recognized that the defendant employee "was not a key managerial employee, and,

therefore, owed no fiduciary duties to the Company solely by virtue of his

position."[197] At the preliminary injunction stage, the Court found it was more

likely than not that the employee's particular job responsibilities made him an

---

[193] Armistice is the defendant, not Boyd: Boyd was dismissed in the Settlement. D.I. 77; s*ee Fitbit*, 2018 WL 6587159, at *13–15. To be sure, Boyd's knowledge can be imputed onto Armistice. *See BrandRep, LLC v. Ruskey*, 2019 WL 117768, at *6 (Del. Ch. Jan. 7, 2019). Boyd's conduct might be imputed onto Armistice, depending on the facts. *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *50 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE). And Armistice may, in certain circumstances, even join Boyd in the company's circle of attorney-client privilege. *Hyde Park Venture P'rs Fund III, L.P. v. FairXchange, LLC*, 292 A.3d 178, 184 (Del. Ch. 2023). But those cases are limited to the imputation of knowledge and conduct; Boyd's fiduciary status is not imputed onto Armistice. An investor does not become a fiduciary simply because it has a board designee. *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *20, n.18 (Del. Ch. Aug. 20, 1996) ("The notion that a stockholder could become a fiduciary by attribution (analogous to the result under the tort law doctrine of *respondeat superior*) would work an unprecedented, revolutionary change in our law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors.").

[194] 2009 WL 1387115, at *9.

[195] *Id.* at *5.

[196] *Id.* at *9.

39

agent of the company, specifically his ability to bind the company to contracts.[198] Here, Armistice was not Aytu's agent; Plaintiff fails to satisfy *Triton*'s foundational premise.

Finally, *Fitbit* offers no support either.[199] There, the Court declined to dismiss claims against defendant directors who traded on inside information through funds they controlled.[200] The defendants were the directors, who of course already owed fiduciary duties—not the funds. The Court explained that "to allow these directors, through their controlled funds, to profit from inside information without recourse would be inconsistent with the policy of 'extinguish[ing] all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation' that undergirds Delaware's insider trading law."[201] That makes perfect sense. But the defendant here is the fund, not the director. *Fitbit* does not support imposing fiduciary duties on the fund.

Plaintiff points to no authority holding that possessing confidential information alone creates fiduciary duties. For good reason: if I accepted Plaintiff's theory, every stockholder with a director designee would itself be a fiduciary for purposes of a *Brophy* claim. "The Delaware courts have been

---

[197] *Id.* at *10.

[198] *Id.*

[199] 2018 WL 6587159, at *17.

[200] *Id.* at *13–15.

40

reluctant to extend too broadly the applicability of fiduciary duties."[202]  Plaintiff's

*Brophy* claim fails.

### 3. Aiding And Abetting

Next, I turn to Armistice's aiding and abetting claim.  "To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: '(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants,' and (4) damages proximately caused by the breach."[203]  Armistice challenges the second and third elements.  Plaintiff has not pled knowing participation.

The Amended Complaint alleges the Directors breached their duty of care in approving the Challenged Transactions by not seeking or obtaining enough information about the targets.[204]  Plaintiff alleges Aytu's board received limited

---

[201] *Id.* at \*14 (quoting *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939)).

[202] *Wal-Mart Stores, Inc.*, 872 A.2d at 625.

[203] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (quoting *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 351 (Del. Ch. 1972)).

[204] SAC ¶ 223; AB 7 ("[T]he Director Defendants breached their duty of care in approving the Collusive Transactions, and the Armistice Defendants aided and abetted those breaches."); AB 53.  I do not read the complaint to allege a duty of loyalty violation.  Other than one allegation that the directors "acted in bad faith in rubberstamping" the Challenged Transactions, the complaint does not allege disloyalty by the Directors.  SAC ¶ 184.  Plaintiff explicitly framed the purported breach as a duty of care claim.  *See* AB 51–54, 59–60; D.I. 89 at 56 (stating at oral argument that "Armistice is liable, through Mr. Boyd, for aiding and abetting the Aytu board's breach of the duty of care in approving the Innovus and Cerecor transactions.").

financial information on Innovus and Cerecor from management, did not review the companies' filings or reports despite that limitation, did not retain advisors or obtain a fairness opinion, met only twice in approving each transaction, and rubberstamped both transactions.[205]

Plaintiff alleges Armistice "knowingly participated in and facilitated the Director Defendants' breaches of fiduciary duty by orchestrating the C[hallenged] Transactions and participating in the Board's purported consideration of the terms of the Transactions."[206] Plaintiff asserts that while the Directors were inadequately informed about the Challenged Transaction, Armistice "[b]y virtue of its substantial investments in Innovus and Cerecor and Boyd's position on the Cerecor board" knew material information about those companies that Boyd withheld from Aytu's board.[207] I do not reach whether Plaintiff pleads a predicate breach; the

---

Of course, the fact that Aytu's charter exculpates the Directors from care claims does not preclude a finding that an outsider exploited a care violation and so must face liability for aiding and abetting. *RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 874 (Del. 2015) ("Importantly, while Section 102(b)(7) insulates directors from monetary damages stemming from a breach of the duty of care, its protection does not apply to third parties such as RBC."); *see also Firefighters' Pension Sys. of City of Kansas City, Missouri Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021); Kappauf Aff. Ex. I Art. V. § 2; AB 54 (acknowledging exculpatory provision). Armistice's argument that "[w]ithout an underlying, non-exculpated breach of fiduciary duty, there can be no aiding and abetting claim" is plainly refuted by Delaware law. RB 28.

[205] *E.g.*, SAC ¶¶ 53, 55–56, 58–59, 81, 85–86, 89, 95.

[206] *Id.* ¶ 239.

[207] AB 54; SAC ¶ 239 ("Defendant Boyd and the Armistice Defendants knew, but did not disclose, material adverse information about the business and prospects of Innovus and Cerecor as a result of the Armistice Defendants' significant investments in Cerecor and

claim dies on failure to plead Armistice knowingly participated in the Directors' shortcomings.

"[A] claim for aiding and abetting often turns on meeting the 'knowing participation' element. Therefore, 'there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.'"[208] "[C]onclusory statements that are devoid of factual details to support an allegation of knowing participation will fall short of the pleading requirement needed to survive a Rule 12(b)(6) motion to dismiss."[209]

The "knowing participation" element "involves two concepts: knowledge and participation."[210] The requirement that "the aider and abettor must act with *scienter*" brings in the two distinct concepts of knowledge and participation.[211]

---

Innovus, and Defendant Boyd's role as a member of Cerecor's board of directors. By failing to disclose this information to the Aytu Board, Defendant Boyd and the Armistice Defendants caused the Director Defendants to approve transactions that were materially unreasonable and unfair to Aytu and its stockholders.").

[208] *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2017 WL 3172722, at *9 (Del. Ch. July 24, 2017) (quoting *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990)); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *24 (Del. Ch. May 4, 2005) ("Conclusory statements of knowing participation will not suffice."), *aff'd*, 897 A.2d 162 (Del. 2006); *Shoe-Town*, 1990 WL 13475, at *8 ("A claim of knowing participation need not be pled with particularity. However, there must be factual allegations in the complaint from which knowing participation can be reasonably inferred.").

[209] *Jacobs v. Meghji*, 2020 WL 5951410, at *1 (Del. Ch. Oct. 8, 2020) (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

[210] *Presidio*, 251 A.3d at 275.

[211] *RBC*, 129 A.3d at 862.

And "the requirement that the aider and abettor act with *scienter* makes an aiding and abetting claim among the most difficult to prove."[212]

"To prove *scienter* for an aiding and abetting claim, a plaintiff must prove two types of knowledge."[213]  First, the defendant must "know that the *primary party's* conduct constitutes a breach."[214]  And second, the defendant must "kn[o]w that 'its own conduct regarding the breach was improper.'"[215]  The "aider-and-abettor's knowledge of the fiduciary breach in question and of the wrongfulness of its own conduct, must be actual knowledge."[216]

As to the participation prong, "participation in an aiding and abetting claim requires that the aider and abettor provide 'substantial assistance' to the primary violator."[217]  And where a director's affiliate is charged with aiding and abetting, the complaint must plead participation by that affiliate.[218]  "The requirement of

---

[212] *Id.* at 866; *Presidio*, 251 A.3d at 275 (same); *Binks,* 2010 WL 1713629, at *10 ("The standard for an aiding and abetting claim is a stringent one, one that turns on proof of *scienter* of the alleged abettor.").

[213] *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 394 (Del. 2024).

[214] *Id.* at 390.

[215] *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 2025 WL 1693491, at *22 (quoting *Mindbody,* 332 A.3d at 391).

[216] *Columbia Pipeline*, 2025 WL 1693491, at *33.

[217] *Mindbody*, 332 A.3d at 393.

[218] *In re Hennessy Cap. Acq. Corp. IV S'holder Litig.*, 318 A.3d 306, 329 (Del. Ch. 2024) ("[T]here are no allegations whatsoever that Hennessy Capital took action with regard to the merger or proxy.  This deficiency persists even if Daniel Hennessy's alleged knowledge is imputed to Hennessy Capital.  There are, of course, allegations that Daniel Hennessy participated in the purported wrongdoing.  The Complaint is silent, though,

substantial assistance for a finding of 'knowing participation' emanates from the Restatement (Second) of Torts § 876(b). Many Delaware cases have cited § 876(b) as persuasive authority for what the 'knowing participation' element requires."[219] That section states that "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."[220]

"[A]n aider and abettor's participation in a primary actor's breach of fiduciary duty must be of an active nature,"[221] as compared to mere "passive awareness."[222] In *Mindbody*, the purported aider and abettor reviewed the company's proxy, knew it was deficient, but remained silent despite a contractual

regarding actual participation by Hennessy Capital. The bare statement that Hennessy Capital was involved in the alleged breaches of fiduciary duty are insufficient."), *aff'd*, 2024 WL 5114140 (Del. Dec. 16, 2024) (TABLE).

[219] *Mindbody*, 332 A.3d at 394.

[220] *Id.* (citing Restatement (Second) of Torts § 876 (1979)); *see also Columbia Pipeline.*, 2025 WL 1693491, at *21. In *Mindbody*, the Court adopted a five-factor analytical framework from *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, (Del. Ch. Aug. 27, 2015) and derived from Restatement section 876, comment d, to guide whether the defendant's assistance or participation warranted liability. *See Mindbody*, 332 A.3d at 396 (identifying "whether the defendant's assistance or participation is substantial enough for liability … [1] the nature of the act encouraged, [2] the amount of assistance given by the defendant, [3] his presence or absence at the time of the tort, [4] his relation to the other[,] and [5] his state of mind are all considered").

[221] *Columbia Pipeline*, 2025 WL 1693491, at *27.

[222] *Mindbody*, 332 A.3d at 389, 393; *id*. at 393 ("This substantial assistance requirement can also be understood as requiring active participation rather than 'passive awareness.'").

obligation to inform the company of material omissions.[223]  Because the defendant

"provided no affirmative assistance at all and took no action that actively furthered

[the fiduciary's] disclosure breach," the defendant did not participate in the

breach.[224]

Plaintiff's aiding and abetting theory appears to be a fallback from his theory

of transaction-specific control:  that Armistice orchestrated or directed the

Challenged Transactions.  His brief defended his knowing participation allegations

with only four sentences, and no law.[225]  I have already concluded Plaintiff did not

plead transaction-specific control; for the same reasons, the Amended Complaint

does not plead that Armistice orchestrated or directed either Challenged

Transaction.

That leaves Plaintiff's allegation that Armistice "participat[ed] in the

Board's purported consideration,"[226] and that Armistice knew information the

---

[223] *Id.* at 399–400.

[224] *Id.* at 390.  The high court distinguished the *Mindbody* facts from situations where a defendant "purposefully misled the board and created an informational vacuum" and committed fraud on the board.  *Id. at* 401 (addressing *RBC*, 129 A.3d at 862–65).

[225] AB 54 ("In addition to alleging the Director Defendants' breaches of fiduciary duty, the Complaint also alleges the Armistice Defendants' knowing participation in those breaches. Armistice orchestrated the Collusive Transactions and, through Boyd, actively participated in the Board's consideration of those transactions. By virtue of its substantial investments in Innovus and Cerecor and Boyd's position on the Cerecor board, Armistice knew that the Innovus business was failing, as were the products in the Pediatric Portfolio. Yet, Armistice failed to share that information with the Board, and actively worked to push through both transactions.").

[226]  SAC ¶ 239.

Directors did not know, but did not share it. "[T]here are no allegations whatsoever that [Armistice] took action" with regard to the Challenged Transactions.[227] Plaintiff's allegation of "participation in the Board's consideration" is conclusory.

Plaintiff does allege Armistice knew information that the board did not, and withheld it. But, under these facts, Armistice did not actively participate; it only had passive awareness.[228] Even assuming Armistice, through Boyd, knew the Directors were working off of inadequate information, Armistice's silence was not "affirmative assistance" and did not "actively further[]" the Directors' failure to inform themselves.[229] Plaintiff does not plead that Armistice created an informational vacuum or misled Aytu's board in any way.[230] Rather, he asserts the Directors were negligent in their own information-gathering and reliance on

---

[227] *See Hennessy Cap.*, 318 A.3d at 329.

[228] *Mindbody*, 332 A.3d at 389–401. Nor does Plaintiff plead that Armistice actively exploited the board's lack of knowledge, played a role in crafting the board's materials, or advised the board on Innvous and Cerecor. *Cf. id.* at 393 ("[O]ur case law in the corporate governance context has found liability only where there has been overt participation such as active 'attempts to create or exploit conflicts of interest in the board' or an overt conspiracy or agreement between the buyer and the board as described above." (quoting *Malpiede*, 780 A.2d at 1097)).

[229] *Mindbody*, 332 A.3d at 398.

[230] *E.g.*, *RBC* 129 A.3d at 862–63; *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *31 (Del. Ch. Mar. 11, 2019) ("The method of facilitating the breach can include 'creating the informational vacuum' in which the board breaches its duty of care." (collecting cases)).

management.[231]  Armistice was not an Aytu fiduciary or advisor, and did not speak for either Innovus or Cerecor in due diligence.[232]  Armistice did not mislead Aytu's board or cause its lack of information.[233]  Boyd was present for deliberations, and knew information he withheld and should have shared as a director; but Plaintiff does not plead or argue Boyd's participation can or should be imputed to Armistice.[234]

Plaintiff fails to plead Armistice actively participated in the Challenged Transactions.  The aiding and abetting claim fails.

### 4.  Unjust Enrichment

This brings us to Plaintiff's unjust enrichment claim against Armistice. Unsurprisingly, this claim is also dismissed.  Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good

---

[231] Indeed, much of the information complained about was openly available to the board through public filings.  *See, e.g.*, SAC ¶¶ 83, 88, 124.

[232] *E.g.*, *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *15 (Del. Ch. Aug. 29, 2018) (declining to dismiss a claim against financial advisor who "used a manipulated valuation to support a fairness opinion" and created an informational vacuum).

[233] *Mindbody*, 332 A.3d at 401 (distinguishing *RBC*, 129 A.3d at 862–66).

[234] *Hennessy Cap.*, 318 A.3d at 329 (requiring distinct allegations of active participation by a director's affiliate); *but see PLX*, 2018 WL 5018535, at *50 (Del. Ch. Oct. 16, 2018) (imputing, post-trial, director designee's conduct and knowledge onto entity for purposes of aiding and abetting claim).  *PLX* explained its "holding does not stand for the proposition that the actions of the director representative of a stockholder can always be attributed to a stockholder."  *Id.*

conscience."[235]  "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, [and] (4) the absence of justification . . . ."[236]  Plaintiff asserts unjust enrichment in connection with the Challenged Transactions and the Trades.  Armistice argues the unjust enrichment claim should be dismissed because it is duplicative of Plaintiff's now-dismissed claims.[237]  I agree.

"The Court frequently treats duplicative fiduciary duty and unjust enrichment claims in the same manner when resolving a motion to dismiss.  For example, if the Court dismisses a fiduciary duty claim for failure to state a claim, then it very likely also dismisses a duplicative unjust enrichment claim."[238]  The Court will do so when "it is fair to say that the unjust enrichment claim depends *per force* on the breach of fiduciary duty claim" and "[t]here is no evidence in the record or argument submitted to the Court that th[e] unjust enrichment claim is materially broader than or different from the analogous breach of fiduciary duty claim."[239]  That is the case here.  Plaintiff's unjust enrichment claim is based on the wrongdoing underlying its breach of fiduciary duty and aiding and abetting claims,

---

[235] *Hennessy Cap.*, 318 A.3d at 328 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010), *aff'd*, 2024 WL 5114140 (Del. Dec. 16, 2024)).

[236] *Nemec*, 991 A.2d at 1130.

[237] OB 42; RB 25–27.

[238] *Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014).

[239] *Id.*

which are dismissed.

### III.   CONCLUSION

Armistice's motion to dismiss is granted with prejudice.